# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

WILLIAM NEWTON RUDD,
    *Defendant-Appellant.*

No. 10-50254

D.C. No.
8:07-cr-00163-
AHS-1

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, Senior District Judge, Presiding

Argued and Submitted
August 5, 2011—Pasadena, California

Filed November 23, 2011

Before: Kim McLane Wardlaw and Marsha S. Berzon,
Circuit Judges, and Ronald M. Whyte,
Senior District Judge.*

Opinion by Judge Wardlaw

---

*The Honorable Ronald M. Whyte, Senior District Judge for the U.S. District Court for Northern California, San Jose, sitting by designation.

**COUNSEL**

Sean K. Kennedy, Federal Public Defender, and Jonathan D. Libby, Deputy Federal Public Defender, Los Angeles, California, for defendant-appellant William Newton Rudd.

André Birotte Jr., United States Attorney, and Dennise D. Willett and Anne C. Gannon, Assistant United States Attorneys, Santa Ana, California, for plaintiff-appellee United States of America.

**OPINION**

WARDLAW, Circuit Judge:

William Newton Rudd appeals the district court's imposition of a residency restriction as a special condition of supervised release, following his conviction and sentencing for one count of violating 18 U.S.C. § 2423(c), which prohibits U.S.

citizens from traveling to a foreign country and engaging in illicit sexual conduct. The special condition prohibits Rudd from residing "within 2,000 feet of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18." We have jurisdiction pursuant to 18 U.S.C. § 3742. Because the district court did not provide any explanation for its imposition of the 2,000 foot residency restriction, and none is apparent from the record, the district court committed procedural error. Thus, we vacate the special condition and remand to the district court to explain or reconsider the 2,000 foot residency restriction.

## I.

In 2004, Rudd was employed as a contractor for the United States Agency for International Development (USAID) in Bangladesh. The Immigration and Customs Enforcement (ICE) attaché in Singapore received a report that Rudd was engaging in sexual conduct with boys of primary school-age in Bangladesh. Based on this report, the Bangladesh National Police (BNP) executed a search warrant at Rudd's hotel room in June 2004. Ultimately, the police unearthed evidence that Rudd had engaged in sexual conduct with four primary school-age boys between 2002 and 2004.

In October 2009, pursuant to a written plea agreement, binding under Federal Rule of Criminal Procedure 11(c)(1)(C), if accepted by the court, Rudd pleaded guilty to one count of engaging in illicit sexual conduct in foreign places in violation of 18 U.S.C. § 2423(c). Rudd and the government agreed that a sentence of seventy-eight months imprisonment was appropriate. The government proposed a fifteen-year term of supervised release, but there was ultimately no agreement on the length of supervised release. Rudd acquiesced to the imposition of the general conditions and fourteen additional special conditions of supervised release by waiving his right to appeal those conditions. These

special conditions included prohibitions against frequenting or loitering within 100 feet and residing "within direct view of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18." In the plea agreement, Rudd expressly preserved his right to appeal any special condition of supervised release not listed in the agreement.

In its presentence investigative report (PSR) and letter, the Probation Office recommended several additional terms and conditions of supervised release, including the condition at the heart of this appeal:

> 17. The defendant shall not reside within 2,000 feet of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18. The defendant's residence shall be approved by the Probation Officer, and any change in residence must be pre-approved by the Probation Officer. The defendant shall submit the address of the proposed residence to the Probation Officer at least 10 days prior to any scheduled move.

In his sentencing memorandum, Rudd objected to the Probation Office's "recommendations for the terms and conditions of supervised release," requesting instead that "the Court . . . adopt the terms and conditions and language of the plea agreement," which were "carefully negotiated between the parties and are consistent with the intent and purpose of protecting the public."

The district court accepted the Rule 11(c)(1)(C) plea agreement in its tentative sentencing ruling, but overruled Rudd's objections. The district judge found only "two significant conditions recommended by the Probation Office that are absent from the plea agreement," conditions that she determined to be "warranted under the facts of this case": "(1) forbidding

contact with the victim and (2) forbidding international travel." In contrast, the district judge found all other recommendations by the Probation Office that diverged from the plea agreement to constitute only "minor variations" from the agreement. The district court sentenced Rudd to seventy-eight months imprisonment and ten years of supervised release, adopting all of the Probation Office's recommended terms and conditions, including the 2,000 foot residency restriction.

## II.

We review a district court's decision to impose a particular condition of supervised release for abuse of discretion. *United States v. Lakatos*, 241 F.3d 690, 692 (9th Cir. 2001). The burden of establishing the necessity of any condition falls on the government. *United States v. Weber*, 451 F.3d 552, 558-59 (9th Cir. 2006).

The government contends that we must review the district court's imposition of the 2,000 foot restriction for plain error, arguing that Rudd "never objected to the condition at all." However, the government entered into a binding plea agreement with Rudd, in which he expressly preserved his right to appeal any special condition not listed in the plea agreement. Moreover, the government's argument fails to acknowledge that Rudd's sentencing memorandum specifically stated that he objected to the terms and conditions recommended by the Probation Office. Rudd not only objected but requested the Court to "adopt the terms and conditions and language of the plea agreement."

Having both preserved his right to appeal in the binding plea agreement accepted by the court and restated his objection to the different conditions recommended by the Probation Office in his sentencing memorandum, it was both unnecessary and futile for Rudd to further object. *United States v. Autery*, 555 F.3d 864, 871 (9th Cir. 2009) (holding that where "the court is already apprised of the parties' positions and

what sentences the parties believe are appropriate . . . , requiring the parties to restate their views after sentencing would be both redundant and futile, and would not 'further the sentencing process in any meaningful way,' " and thus reviewing the sentence for abuse of discretion) (internal citations omitted).[1]

## III.

In reviewing sentences, we first consider whether the district court committed procedural error. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). "It would be procedural error . . . to fail adequately to explain the sentence selected . . . ." *Id*. A sentencing judge must explain a sentence sufficiently to communicate "that a reasoned decision has been made" and "permit meaningful appellate review." *Id*. at 992. However, we have held that the district court "need not state at sentencing the reasons for imposing each condition of supervised release, *if it is apparent from the record*." *United States v. Blinkinsop*, 606 F.3d 1110, 1119 (9th Cir. 2010) (emphasis in original) (vacating and remanding condition of supervised release under plain error review to allow the district court to consider arguments raised by defendant on appeal); *see also Carty*, 520 F.3d at 992 (holding that an explanation "in some cases may also be inferred from the PSR or the record as a whole"); *United States v. Daniels*, 541 F.3d 915, 924 (9th Cir. 2008) ("[A] sentencing judge is not

---

[1]There is no question that Rudd did not articulate the basis for his objection to the 2,000 foot residency restriction before the district court. However, the government argues only that Rudd "never actually objected to the Probation Office's version" of the residency restriction, a statement plainly at odds with the plea agreement and Rudd's sentencing memorandum. Because the government also fully briefed its argument that the district court adequately explained the reasons for imposing the Probation Office's version, the government is not prejudiced by our determination that Rudd sufficiently preserved the 2,000 foot residency restriction issue for appeal. *See Singh v. Ashcroft*, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004) (holding that a court may review an issue that was improperly raised if doing so would not prejudice the opposing party) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)).

required to articulate on the record at sentencing the reasons for imposing each condition of supervised release, where we can determine from the record whether the court [erred]").

We then turn to review the substantive reasonableness of the sentence. In making that determination, we must consider "the totality of the circumstances." *Carty*, 520 F.3d at 993. "A substantively reasonable sentence is one that is 'sufficient, but not greater than necessary' to accomplish § 3553(a)(2)'s sentencing goals." *United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009) (quoting 18 U.S.C. § 3553(a)). "[T]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (quoting *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc)); *see also United States v. Ellis*, 641 F.3d 411, 423 (9th Cir. 2011).

## IV.

The district court committed procedural error by failing to explain why it imposed the 2,000 foot residency restriction, rather than the much less restrictive residency condition specified in the plea agreement.[2] The reasons for its decision to impose the 2,000 foot residency restriction as a condition of Rudd's supervised release are neither explained in, nor apparent from, the record.

The district court addressed Rudd's objection to the Probation Office's recommended terms and conditions in its tenta-

---

[2]Although the plea agreement was binding under Rule 11(c)(1)(C), the district court had the discretion to decide which special conditions it would impose under the terms of the plea agreement. The parties did not stipulate that the district court was required to impose the conditions listed in the plea agreement. They agreed only that Rudd preserved his right to appeal conditions that were not listed in the plea agreement.

tive ruling, noting that "Defendant urges adoption of the terms and conditions for defendant's supervised release contained in the plea agreement . . . ." However, the district court inaccurately stated that "Defendant admits that most of the terms and conditions of supervised release in the plea agreement are virtually identical to those recommended by Probation." Rudd made no such admission. Rather, he stated that "most of the terms and conditions that probation recommends overlap and are consistent with those already agreed to by the parties . . . ," but still insisted that the district court adopt the terms, conditions and language of the plea agreement.

The district court next identified two conditions recommended by the Probation Office that it thought were "significant," the conditions forbidding contact with the victims and foreign travel, and explained that those "two conditions are warranted under the facts in this case."[3] It dismissed the remaining differences as "minor variations." However, the only other condition that actually differed from the terms of the plea agreement was the 2,000 foot residency restriction. The difference between a condition prohibiting residence within 2,000 feet and one prohibiting residence "within direct view" of places primarily used by persons under the age of 18 can hardly be described as a "minor variation." The district court's discussion was therefore inadequate to explain why it viewed the stricter condition as warranted in this case. Moreover, neither the PSR, the Probation Office's sentencing recommendation letter, nor the transcript of the sentencing hearing offers any explanation whatsoever for the court's rejection of the "direct view" condition in favor of the 2,000 foot residency restriction in Rudd's case.

---

[3]The district court was correct in this assessment. Rudd was convicted of traveling to a foreign country where he preyed upon boys ranging in age from eight to fourteen. Despite the sexual abuse, the victims still held Rudd in great esteem, some "viewing him as a grandfather figure," no doubt due to the financial assistance, tuition payments, and other gifts Rudd bestowed upon his young victims.

**[1]** The nature and circumstances of Rudd's offenses demonstrate that Rudd poses a serious danger to children. It is evident that a condition minimizing his temptation and ability to prey upon children is supported by the record. What is not evident from the record is why forbidding residence within direct view of places primarily used by persons under the age of 18 is insufficient to deter Rudd from further contact with minors, or how the 2,000 foot requirement suggested by the Probation Office and adopted by the court would further reduce the risk of such conduct upon Rudd's release from prison at or near age seventy-three. Because the reasons for imposing the condition are not apparent from the record, the district court was required to state them at sentencing. *Blinkinsop*, 606 F.3d at 1119. Absent further explanation, the record neither communicates "that a reasoned decision has been made," nor is sufficient to "permit meaningful appellate review." *Carty*, 520 F.3d at 992.

A greater exposition of reasons is particularly necessary for procedural soundness where the district court is choosing among several sentencing options. Here, the district court chose specifically to adopt a residency restriction of 2,000 feet, instead of other potential distances or approaches. As noted, Rudd's plea agreement contemplated — indeed, Rudd waived his right to appeal — a similar residency restriction that would have prohibited Rudd from living "within direct view" of places primarily used by people under the age of eighteen. Other jurisdictions across the country have adopted sex offender residency restrictions as a matter of law, several of which adopt distances much less than 2,000 feet. *Compare Mikaloff v. Walsh*, No. 5:06-CV-96, 2007 WL 2572268, at *9 (N.D. Ohio 2007) (reviewing law prohibiting sex offenders from residing within 1,000 feet of schools and daycare centers), *State v. Pollard,* 908 N.E.2d 1145, 1150 (Ind. 2009) (reviewing residency restriction prohibiting sex offenders from living within 1,000 feet of school property, a youth program center, or a public park in Indiana), *and Commonwealth v. Baker*, 295 S.W.3d 437, 444 (Ky. 2009) (reviewing 1,000

foot residency restriction for sex offenders from schools, publicly owned playgrounds, or licensed daycare facilities in Kentucky) *with Fross v. County of Allegheny*, 20 A.3d 1193, 1199 (Pa. 2011) (reviewing local Pennsylvania ordinance restricting sex offenders from residing within 2,500 feet of any school, public park, community or recreational center, or childcare facility in Allegheny County) *and G.H. v. Township of Galloway*, 951 A.2d 221 (N.J. Super. Ct. App. Div. 2008) (reviewing New Jersey ordinances restricting sex offenders from residing within 2,500 feet of any school, park, playground, public library, or daycare centers).

**[2]** It is unclear, at least from this record, what residency restriction would be sufficient but "involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Daniels*, 541 F.3d at 924; *United States v. Rearden*, 349 F.3d 608, 618 (9th Cir. 2003). Would a residency restriction of 1,000, 3,000, or even 5,000 feet each be appropriate without any further explanation solely because of the nature and circumstances of Rudd's conviction? In the absence of any explanation of how the chosen distance furthers the purposes of Rudd's supervised release, the choice of 2,000 feet appears arbitrary. We thus conclude that the district court was required to provide an explanation for choosing the 2,000 foot residency restriction.[4]

---

[4]We reject Rudd's argument that a heightened procedural requirement should apply because the condition of supervised release restricts his fundamental rights. "We have carved out an exception to this general rule for conditions of supervised release that implicate a particularly significant liberty interest." *United States v. Stoterau*, 524 F.3d 988, 1005 (9th Cir. 2008). When such an interest is at stake, "the district court must follow additional procedures and make special findings." *Id*. But we have only applied this heightened procedural requirement in rare cases, each involving the "constitutional interest inherent in avoiding unwanted bodily intrusions or manipulations." *Id*.; *see United States v. Cope*, 527 F.3d 944, 955 n.5 (9th Cir. 2008) (chemical castration); *United States v. Weber*, 451 F.3d 552, 560-62 (9th Cir. 2006) (penile plethysmograph testing); *United States v. Williams*, 356 F.3d 1045, 1056-57 (9th Cir. 2004) (mandatory use of antipsychotic medication). The residency restriction here does not implicate such a significant liberty interest. Regardless, the district court's explanation fails to satisfy even the usual standard.

The government's argument that the district court's ten-page tentative sentencing ruling demonstrates the district court's reasoned consideration of the parties' arguments and suffices as an adequate explanation of the sentence is unavailing. We agree that the district court's tentative ruling demonstrates ample consideration of many aspects of the record in determining the ultimate sentence. However, nothing in the tentative ruling specifically addresses the 2,000 foot residency requirement, except the reference to "minor variations," or offers any reason or basis for imposing it as a condition of supervised release. In fact, the government concedes that the district court's sole specific explanation addresses only the two other additional conditions recommended by the Probation Office — forbidding contact with the victims and international travel.

**[3]** We thus vacate the 2,000 foot residency restriction and remand for the district court to further explain or reconsider the condition. Given the lack of apparent basis for the restriction in the record, the district court must, at a minimum, articulate a basis for imposing the condition, tailored to the nature and circumstances of Rudd's offense and his specific character and history.

## V.

Under 18 U.S.C. § 3583(d), a district court may impose special conditions of supervised release, provided that they "are reasonably related to the goal of deterrence, protection of the public, or rehabilitation of the offender, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Daniels*, 541 F.3d at 924; *Rearden*, 349 F.3d at 618.

**[4]** We do not reach the question of the substantive reasonableness of the 2,000 foot residency restriction because we conclude the district court erred procedurally. However, the district court should address the 18 U.S.C. § 3553 factors in

reconsidering the residency restriction, particularly whether it is "a greater deprivation of liberty than is reasonably necessary," *Daniels*, 541 F.3d at 924. This question is of particular concern should the authorities release Rudd in an urban neighborhood, where "places primarily used by persons under the age of 18" are both ubiquitous and transient.[5] The Supreme Court and several other courts have expressed concerns about the burdens imposed by similar geographical or sex offender residency restrictions. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 562 (2001) (noting that a Massachusetts regulation prohibiting outdoor advertising within 1,000 feet of schools or playgrounds would "[i]n some geographical areas . . . constitute nearly a complete ban . . . [and] prevent advertising in 87%-91% of Boston, Worchester, and Springfield, Massachusetts"); *Pollard,* 908 N.E.2d at 1150 (finding a 1,000 foot residency restriction to create a "substantial housing disadvantage" that "affect[ed] one's freedom to live on one's own property"); *Baker*, 295 S.W.3d at 444 (finding a 1,000 foot residency restriction would "prevent the registrant from residing in large areas of the community"); *Galloway*, 951 A.2d at 236 (finding a 2,500 foot residency restriction to result in "total exclusion" or "near-total exclusion" because "the majority of the overall land area (including uninhabitable portions such as the [airport], marshlands, etc.) of cities and other densely populated areas fall within the prohibited zones"); *Fross*, 20 A.3d at 1199 (noting that a 2,500 foot residency restriction "essentially prohibit[ed] any sex offender from living throughout most of Allegheny County").[6]

---

[5]We note that by comparison to the legislatively enacted restrictions discussed above, which prohibit residence near specific locations, such as schools, public parks, playgrounds, and childcare facilities, the condition here not only specifies such places, but tags on the vague reference to "places primarily used by persons under the age of 18." This provision could refer to anything from malls and hamburger or pizza joints to movie theaters, bowling alleys and skating rinks.

[6]This consideration is particularly relevant in Rudd's case because he will be between seventy-three and eighty-three years old during his period of supervised release. At that age, depending on his health needs, his residential options may be limited, especially if he must live in close proximity to medical or other care facilities.

Several courts have also found that similar residency restrictions subject defendants to a state of "constant eviction," because the prohibited locations could potentially move or open in new places. *See Mikaloff*, 2007 WL 2572268, at *9 (finding that residency restriction subjected sex offenders to "constant eviction" because "there are no guarantees a school or daycare will not open up within 1,000 feet of anywhere"); *Pollard*, 908 N.E.2d at 1150 (finding that residency restriction subjected the offender "to constant eviction because there is no way for him or her to find a permanent home in that there are no guarantees a school or youth program center will not open within 1,000 feet of any given location"); *Baker*, 295 S.W.3d at 444 (finding a 1,000 foot residency restriction to risk "expel[ling] registrants from their own homes, even if their residency predated the statute or arrival of the school, daycare, or playground"). And, given the condition here, there is similarly no guarantee that teens will not decide to start regularly hanging out at a new spot within 2,000 feet of Rudd's residence.

**[5]** 18 U.S.C. § 3583(d)(2) requires district courts to consider the liberty interests at stake in fashioning an appropriate sentence. After all, the scope of a residency requirement will determine whether the releasee, as well as his children and family members, if any, can meaningfully participate in a community and have adequate access to schools, public transportation, rehabilitation programs, and medical care. There remain significant questions regarding the substantive reasonableness of residency restrictions, including whether they too stringently restrict where a defendant can reside, or whether they play a role in increasing the likelihood of recidivism, *see In re Moreland*, No. PV 000527, at *7-8 (L.A. Super. Ct. Nov. 1, 2010) (order discussing adverse public safety effects of residency restrictions); Cal. Dep't of Corr. and Rehab., "*Sex Offender Supervision and GPS Monitoring Task Force Report*, at 17 (2010)," *available at* http://www.cdcr.ca.gov/News/docs/Sex_Offender_and_GPS_Task_Force_Report.pdf (concluding that effect of residency restrictions is to put sex

offenders in a position where they "are at increased risk to re-offend"); Grant Duwe, Residency Restrictions and Sex Offender Recidivism: Implications for Public Safety, 2 *Geography & Pub. Safety* 6, 6 (2009), *available at* http://www.cops.usdoj.gov/RIC/Publications/e050919205-gps.pdf ("Other research suggests that residency restrictions decrease employment opportunities for offenders and increase transience and homelessness."); Ron Wilson, Geographic Research Suggests Sex Offender Residency Laws May Not Work, 2 *Geography & Pub. Safety* 11, 12 (2009), *available at* http://www.cops.usdoj.gov/RIC/Publications/e050919205.pdf ("Residency restriction laws . . . may endanger communities because they make offenders more difficult to monitor."). The district court should give some consideration as to whether the 2,000 foot residency restriction imposes any deprivation of liberty greater than what is necessary for the purposes of Rudd's supervised release.

## VI.

We therefore vacate the special condition of supervised release prohibiting residence within 2,000 feet of "school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18." We remand this case to the district court to reconsider or explain the reason for its imposition during Rudd's ten-year period of supervised release.

**VACATED and REMANDED for resentencing.**